## NEW YORK OYER AND TERMINER.

APRIL, 1850.

Before EDMONDS, Justice, and two aldermen.

### THE PEOPLE v. CHARLES CROWE.

When homicide is justifiable, and who is to be the judge whether there is reasonable ground to apprehend danger.

In such case the danger must be to the person, and not to property.

The difference between manslaughter in the third and fourth degrees.

To constitute the third degree, the two elements — heat of passion and dangerous weapon — must both be present.

THE prisoner was indicted for murder. He was an Irishman, and had emigrated to this country in 1847. In 1850 he lived with his family in the lower part of Pearl street, and kept a small store in the basement. His wife kept boarders, among whom was William White, the deceased.

Prisoner had made a bargain with White to sell out the store to him for $450, on which $80 had been paid. A dispute arose between them, W. claiming immediate possession of the store, and prisoner refusing to give it up until all the money was paid. In consequence of this dispute W. was turned away as a boarder, and after that made several attempts during the ensuing two or three weeks to obtain possession. On one occasion, at a late hour at night, when prisoner was absent from home, W. broke into the store by force and attempted to turn prisoner's wife out of doors. She, however, obtained help and drove him away. Thereupon prisoner had him arrested and tried at the Sessions, where he was sentenced to pay a fine of $10 or two months imprisonment. He paid the fine after a few day's confinement. At another time he forced his way into the store in the day-time, in prisoner's absence. He had a whip in his hand, and threatened to beat Mrs. C.

The People v. Charles Crowe.

W. was under great excitement about the store for some time. At one time he told prisoner that he was boss of the shanty, and would do as he liked; would set fire to it, if he pleased, and would like to see the man who would put him out; he had as much straight law and crooked law as a donkey would draw, and there was no use in prisoner's contending with him. At another time, on a Sunday night, he came, with two or three others, when prisoner was absent, and knocked at the back door and demanded admittance; said he would get in, and if they did not let him in he would break in and have all their lives; and he broke in the window and took out the sash.

When he was on trial for this violence, he threatened the justice who tried him, and said that when he got out he would make the prisoner " crow."

At another time he tried to borrow a pistol, and said he wanted to kill a d——d Irishman. Before the justice he had said he would take possession forcibly, and, as he went to prison, he threatened the prisoner. A short time before he was shot he armed himself with a club, and said that Crowe had had him in prison, and he was going down to his house to have satisfaction. At another time he had said if there was no law to give him possession, he would take the law in his own hands. At another time he said he had got a gun, and was going down and would have possession, or there would be a corpse; and he told the prisoner that he was a Mexican warrior, and had fought the battles there, and cared no more for the life of a man than of a dog, and would have the place in spite of him; that he had often trampled on the bodies of human beings, and cared not a God damn pin for them.

These things coming to the knowledge of the prisoner, he obtained a gun, and kept it in his house, loaded. He went to the captain of police in his ward, and asked if he could use firearms in self-defense, and was told that if he was in dread of his life, and in the last necessity, he had a right to use firearms to defend himself. He left, saying then he would defend himself.

20—vol. 2.

That same night, at about ten o'clock, after White had armed himself with the club, he went to the prisoner's house and knocked violently at the store door, when there were eight or ten people around. The prisoner came out of his house with the gun in his hand, and cried to the people to get out of the way, he was going to shoot that fellow. They all fled immediately, and White among them. The prisoner followed him closely, and as White stumbled, in trying to get into an adjoining house, the prisoner fired his gun, hitting White in the back, killing him instantly.

At this time the prisoner had a child lying very sick and at the point of death.

The defense interposed for the prisoner was that it was justifiable homicide, and that, if it was not, it was only manslaughter in the fourth degree; for though death had been effected with a dangerous weapon, yet there had been no evidence of any heat of passion on the part of the prisoner, or any excitement, except fear that White would break in and rob, or set fire to the house, or injure his dying child.

*The Judge* charged the jury as follows:

The homicide in this case can be justifiable only on two grounds:

1. If the prisoner was resisting an attempt to commit a felony upon or in his dwelling-house, or —

2. In the lawful defense of himself, his wife or child.

There is no reason to suppose that the deceased was making any attempt to commit a felony in the prisoner's dwelling-house, for a trespass is no felony; and it was, therefore, the second point only that the jury were to consider.

That involved the defense of the persons of the prisoner and his family, and not of his property. The jury would therefore discard from their minds all considerations of the apprehension of fire or robbery, and look only to the question of danger to the persons of the prisoner and his family; and, as to that, the question was, was there a reasonable ground to

apprehend a design to do some great personal injury to them, and was there imminent danger of such design being accomplished?

And in regard to that, the question was, not whether there was actual danger, nor whether the prisoner honestly entertained apprehensions of it, but whether, in the judgment of the jury, under all the circumstances of the case, there was reasonable ground to apprehend such danger to the persons of the prisoner and his family.

That subsequent events showed that there was, in fact, real danger, is not the point, but whether those coming events so cast their shadows before, as to cause well-grounded apprehension of it, and not whether the prisoner apprehended danger, or honestly believed he had cause to apprehend it, but whether, in the opinion of the jury, there was reasonable ground for apprehension.

It was important to keep this distinction in view, for in one case it would be the fears of timidity that would render a homicide justifiable, and, in the other, it would be the fact of reasonable cause, judged of by men of sense and discretion.

If, then, the jury believed that at the time of the homicide there was, in fact, and not merely in the prisoner's mind, reasonable ground to apprehend there was a design to do some great personal injury to the prisoner, or his family, and that there was, in fact, and not merely in his mind, imminent danger of such design being accomplished, they would find the homicide justifiable, and acquit the prisoner of all charge.

But if, on the other hand, they believed that the acts and threats of the deceased were merely to get possession of the store, under the contract of sale, then, no matter what may have been the apprehensions of the prisoner, the homicide was not justifiable, and the prisoner was guilty of either murder or manslaughter.

To find him guilty of murder the jury must be satisfied that when he procured and used the gun he had an intention to take life; and they might well inquire whether his intention was not, rather, to use the weapon just so far as would

be necessary to protect himself and family, and domicil, from the repeated and threatened invasions of the deceased.

If one of these suppositions was as likely to be true as the other, then it would not do for the jury to find an intention to kill, and convict the prisoner of murder.

Then, as to manslaughter, the jury could not find the prisoner guilty in the first or second degrees at all, nor in the third, unless they were satisfied that the killing was both by a dangerous weapon, and in the heat of, and impelled by, passion; and, if not so satisfied, the offense would be manslaughter in the fourth degree.

In looking for evidence of the heat of passion, the jury would not overlook the fears of the prisoner, the provocations he had received, his ignorance of our laws, and, above all, the pains he had taken to inquire of the only authority accessible to him, whether he had a right to use firearms under the circumstances.

At the same time the jury must beware that they did not permit these considerations to carry them too far. For while, if we could look only at the prisoner, we might well say that he was guilty only of a mistake, into which he had been led by the imperfect answer of the police, and he ought therefore to go free. On the other hand, the court and jury have a duty to the public to perform, and that is to so administer the law as shall lay down rules that will protect the lives of the people, even from the consequences of a mistake as to the law.

The prisoner was found guilty of manslaughter in the fourth degree.